### NICK ANDERSON v. PITT IRON MINING COMPANY.[1]

February 7, 1908.

Nos. 15,285—(70).

**Assumption of Risk.**

In an action to recover damages for personal injuries, *held*, that the question whether the plaintiff assumed the risk was properly submitted to the jury, and that the evidence sustains the verdict.

**Same—Assurance of Safety.**

A servant, who is assured by the master that the place in which he is about to do his work is safe and is directed to proceed with his work. may to some reasonable extent and in a proper degree defer to the judgment of the master, and rely thereon. The order and an assurance of safety may properly be considered by the jury, in connection with the other evidence in determining whether or not the employee at the time knew and appreciated the risk.

Action in the district court for St. Louis county to recover $30,800 damages for personal injuries. The case was tried before Dibell, J., and a jury which rendered a verdict in favor of plaintiff for $2,900. A motion for a new trial was granted. From an order denying its motion for judgment notwithstanding the verdict and granting its motion for a new trial, defendant appealed. Affirmed.

*Washburn, Bailey & Mitchell,* for appellant.

*John R. Heino* and *Theo. Hollister,* for respondent.

[1] Reported in 114 N. W. 953.

ELLIOTT, J.

The plaintiff, Anderson, recovered a verdict for damages for personal injuries, and the defendant moved for judgment notwithstanding the verdict or for a new trial. The court granted the motion for a new trial, but denied the motion for judgment. The defendant appealed from the order denying the motion for judgment, and the sole question presented is whether or not the evidence justified the court in submitting the case to the jury and in refusing to order judgment notwithstanding the verdict.

The plaintiff had worked in the mines for something like three years, and for about two years preceding the time of the accident had worked for the defendant as a timber man. The mining was done by driving drifts through the ore; the size of the drift being determined by the condition of the dirt and ore. As the miners drove the drifts into the body of the ore, the timber men would put in the sets of timber, which were necessary to protect the men from falling ore which had been loosened by the blast. These timber sets consisted of two upright posts, seven or eight feet high, and surmounted by a cap running across the drift. The timbers were furnished by the mine already fitted, except when it was necessary to change the post to suit the varying conditions of the floor of the drift. The timber men got the timbers from the timber shaft and took them to the place where they were needed on cars. They followed the miners, who, after blasting, ceased work until the place was made safe. But one class of men could work at the same time. Two of each class worked together, being known as "partners."

On the Friday night preceding the accident plaintiff and his partner had worked in the drift putting up the last timber sets, and on Saturday night they returned to put up the sets where the miners of the day shift had worked. When they appeared ready for their work, the shift boss said to them: "Don't put up sets to-night. We can't get any dirt anywhere, if you put up sets there to-night"—and directed them to work as miners. This they did until about ten o'clock Saturday night, blasting out about twenty five tons of ore, which was removed by the miners on tram cars. According to plaintiff's evidence, the room or space thus formed, as it was on Monday morning, was from fifteen to sixteen feet high, about eighteen feet wide, and

from nineteen to twenty feet long. No work was done on Sunday, so that on Monday morning, when the men arrived to continue work, there was no ore on the floor of the drift. It is conceded that so large a space untimbered, if it existed under the conditions prevailing in the Pitt mine, was an unsafe place in which to do the work of timbering, because of the liability of ore and dirt to fall.

On Monday morning the plaintiff and three other timber men ground their axes preparatory to putting in the timber sets, and went to the end of the drift, where they found six miners, the captain, and the shift boss. One of the timber men named Nevela immediately, and before any work was done in the open room, took an iron scraper (a scraper used by the miners for scraping out the dirt and mud in the drill holes) and began to sound or pole the top or back of the drift to discover any loose places from which ore might fall while they were at work under it. The captain and the shift boss were standing within the timbered portion of the drift, facing toward the open room, where they could watch the sounding being done by the timber men. Nevela was out in the open room, or untimbered portion of the drift, and continued this sounding of the roof with the scraper from two to four minutes, back and forth across the drift. He was seen and heard at this work by the plaintiff, who at the time was also in the timbered portion of the drift, about eight or nine feet from Nevela and five or six feet from the captain. Nevela at the close of the sounding stepped to within five or six feet of the captain and said to him, "There is a loose place in the back," and the captain said, "It is all right; go ahead and put the set in." The timber men then got their timbers, returned, and began to put them up, and after having worked for an hour or two some overhanging ore fell and struck plaintiff and injured him. The sounding was done before they started to work, and the captain was facing toward such work of sounding, and was where he could hear and see what was done by the timber men in the course of such sounding and examination of the roof.

The appellant submits his case upon the claim that the plaintiff assumed the risk of the danger by which he was injured, because (1) the work was that of making a dangerous place safe for the protection of himself and the other workmen in the mine; (2) by reason

of his familiarity with the liability of ore to fall; and (3) that he was not relieved from the assumption of the risk by any order of the captain to go to work, or by any assurance of safety given by the captain.

Conceding that the place in which the plaintiff was working was dangerous, and that it had been made more dangerous by the negligence of the defendant in excavating an unreasonably large space for the men to work in, the question is whether this plaintiff assumed the risks incidental to putting in the timbers under such conditions. We are not impressed by the claim that the case is controlled by the doctrine applicable when an employee is directed to repair defective machinery or to do work which is inherently dangerous. A workman cannot predicate negligence upon the defects which he is employed to remedy. If the plaintiff had been injured while engaged in the ordinary work of putting in the timber sets under ordinary conditions, he would unquestionably have assumed the risks of being injured by falling ore or dirt. Such dangers would have been incidental to the employment. But other elements enter into the present case. The plaintiff and his partner had been prevented from performing their work in the ordinary and usual manner by the interference of the shift boss. The conditions had been made more dangerous by reason of the negligent manner in which the work had been done. With knowledge of such conditions, the captain of the mine, who in this respect represented the defendant, directed the plaintiff to enter the place of danger and put in the timbers, at the time assuring him that "it is all right." There are limits beyond which an employee is not justified in obeying the orders of the employer; but to a certain extent the employee is justified in relying upon the assurances of his employer. The rule is thus stated in Carlson -v. Northwestern Tel. Exch. Co., 63 Minn. 428, 65 N. W. 914:

"It is the duty and the right of the master to give orders and direct the places where his servants shall work. Their duty is instant and absolute obedience, unless it be obvious to them that such obedience will expose them to unusual dangers. Dispatch, discipline, and the safety of person and property in the execution of work imperatively require that the master should order and the servant obey. It

would be practically impossible to carry on a work of any magnitude on any other basis. A workman, when ordered from one part of the work to another, cannot be allowed to stop, examine, and experiment for himself, in order to ascertain if the place assigned to him is a safe one; and therefore, in obeying the order, while he assumes obvious and ordinary risks, he has a right to rely upon a faithful discharge of the master's duty to use ordinary care to warn and protect him against unusual dangers. Any rule or doctrine which deprives the workman of this right and protection when the master delegates the power and duty of giving such orders to a subordinate, no matter how high or low his rank or grade, is unsupported by reason, violates all considerations of justice, and is not supported by the weight of authority."

We think that, under the evidence, it was a question for the jury to determine whether or not the plaintiff assumed the risks, in view of his knowledge of the conditions and the direction given him by the captain of the mine. Plaintiff claims that on the morning when he was injured he was told by the captain, in the presence of the shift boss, that the place where the timbering was to be done was all right and to go ahead with the timbering.

The trial court instructed the jury that: "A servant who is assured by the master that the place in which he is about to do his work is safe, and is directed to proceed with his work, may to some reasonable extent and in a proper degree defer to the judgment of his master, and to a proper extent may rely upon it. He may defer somewhat to the judgment of his superior in determining what the risks are. The fact that an assurance of safety was given to the plaintiff, coupled with a direction to go ahead and do the work, if you find such to be the fact, is proper for your consideration in determining whether the plaintiff did in fact assume the risks of falling dirt injuring him while he was timbering. It does not follow, from what has just been said, that the servant is in all cases wholly absolved from the assumption of risk because of an assurance of safety. If he in fact knows and appreciates the risk, knows and appreciates it after the assurance of safety, he cannot rely absolutely upon the assurance of safety as an answer to the claim that he assumed the risk. Knowing

and appreciating the risk, he must still take the chance, if he chooses to do so; and, if he is injured, he is not relieved from the assumption of risk. But the fact that an assurance of safety is given is a fact proper for consideration by you in finding whether he did assume the risk." This instruction correctly states the law applicable to the case and leaves little more to be said.

The plaintiff testified that, when the captain said it was all right and to go ahead with the timbering, he relied upon the statement and believed the place to be safe. It was for the jury to consider this evidence, in connection with the other testimony as to the plaintiff's knowledge and appreciation of the risk.

Order affirmed.