## MIKE HAIDUKOVICH v. THE SHENANGO FURNACE COMPANY.[1]

December 18, 1908.

Nos. 15,793—(110).

**Evidence not Clear.**

> Respondent claims to have been injured in appellant's mine as a result of relying upon the mining captain's assurances of safety with respect to the character of timbering required in a certain drift. *Held*, the evidence does not clearly prove that the accident was not a result of the mining captain's orders, and hence appellant was not entitled to judgment notwithstanding the verdict.

Action in the district court for St. Louis county to recover $1,999 for personal injuries received while employed by defendant. The case was tried before Cant, J., and a jury which returned a verdict for $375 in favor of plaintiff. From orders denying its motion for judgment notwithstanding the verdict and granting a new trial, defendant appealed. Affirmed.

*E. C. Kennedy* and *Boyle & Dacey,* for appellant.

*Charles E. Adams* and *Joseph E. Austin,* for respondent.

LEWIS, J.

Respondent recovered a verdict of $375. Appellant moved for judgment notwithstanding the verdict upon the ground that there was no evidence to sustain any charge of negligence, and respondent made a motion for a new trial upon the ground that the verdict was inadequate. The trial court granted respondent's motion for a new trial, and denied appellant's motion, which order was appealed from.

Respondent was injured, while operating as a miner in appellant's iron mine, by the caving in of a part of the roof of the drift wherein respondent was engaged in timbering the same. All of the many grounds of negligence charged in the complaint were abandoned at the trial, or have dropped out from failure of proof, except the one that appellant's mining captain directed respondent to timber the mine in a certain manner, assuring him that it was safe so to do, upon

[1] Reported in 118 N. W. 1017.

which assurance respondent claims to have relied, and that it was the proximate cause of the accident.

The evidence is very conflicting, and we have had some difficulty in ascertaining the exact facts. As far as we are able to understand the record, main drifts had been constructed in a certain level from the vicinity of the shaft to the outer extremity of the ore body, leaving a body of ore between. These drifts were about eight feet wide and eight or nine feet high, and were timbered in the usual manner by placing upright posts about every six feet apart as the work of excavation proceeded, across which caps were placed, and from cap to cap an overhead protection called "lagging." Each of these six-foot sections is called a "set." Prior to the time respondent and his partner commenced work in this part of the mine, a cross-cut drift had been begun from one of the main drifts, running along the outer edge of the ore body. It was of the same dimensions, eight by nine feet, and had been timbered in the usual manner. Respondent and his partner had a contract to take out ore, and were directed to continue the operations of extending the cross-cut drift, or, as some of the witnesses expressed it, to slice out the pillar of ore between the two main shafts.

According to the evidence received on behalf of respondent, a few days prior to the accident, while respondent and his partner were at work in extending this cross-cut drift, instead of using sets of timbering six feet in length, as was the usual custom in main drifts, they put in a set every two feet, and while conducting the work in that manner, the mining captain came along and ordered them to knock out the two-foot sets and put in longer ones. Respondent explained to him that they thought it safer to use the two-foot sets, to which the captain replied that it was a new mine and safe to use the longer sets, and that there was no danger. Respondent, relying on the captain's judgment, discontinued using the two-foot sets, and put in the longer ones. For the next few days after this conversation the miners carried the drift through to the opposite main drift, and completed the timbering in the usual way, and then went back to the beginning of the cross-cut, in which they had been working, and commenced a second drift over the first one, intending thereby to take out all of the ore up to the top of the ore body, which it seems was about eight feet high above the lagging of the first drift. To carry

on these operations it was necessary to blast ahead and form an excavation large enough to put in place a set of timbering, and respondent claims that it was necessary to place the posts for the upper set directly upon the posts of the lower set. This work upon the second (or upper) level had proceeded some time, and respondent and his partner were engaged in placing a cap upon the post which had been put in position. It was found that the cap was an inch too long, so the partner held one end of the cap up, while respondent took a pick and proceeded to pick away part of the wall in order to make room for it, and as a result the dirt loosened and rolled down, put out the candles, and the men fell down through the lagging into the drift below, about nine feet, and respondent broke his leg.

According to the practice in mines, miners conducting operations of this character are required to select their own material, prepare it, and do their own timbering. The mining company supervises all mining operations to the extent that it directs the manner in which the shafts, drifts, or cross-cuts shall be constructed, and under the law is required to exercise ordinary care in the mining operations to the extent of seeing that the drifts and timbering are constructed and maintained in a safe condition. While the miners are required to select the material and to put it in place, yet if the company, for its own purposes, undertakes to direct the manner in which ore shall be taken out and the timbering be done, then the miners are justified in accepting and following out such directions. This does not mean that they themselves are exempted from the exercise of due care merely because the company issues an order in some particular matter, but in determining whether the miners have been guilty of contributory negligence it is permissible to take into consideration the orders and directions of those in authority over them. Such is the rule in Anderson v. Pitt Iron Mining Co., 103 Minn. 252, 114 N. W. 953, and Tomazin v. Shenango Furnace Co., 103 Minn. 334, 114 N. W. 1128.

Under the circumstances as developed by the evidence it does not conclusively appear that the respondent was guilty of contributory negligence in picking off the side of the drift in order to make room for the cap, instead of which he might have shortened it. We have more difficulty, however, in determining upon what specific ground the appellant was negligent, if at all. If the dirt gave way as a re-

sult of the interference by the captain with the method of procedure adopted by respondent and his partner, and if they had reasonable ground for accepting the captain's assurance as to the safety of that method, then there is evidence tending to sustain the charge; but, if we are correctly informed, the accident did not occur in that part of the lower drift where the timbering had been placed by the men. The accident happened over a set of timbering that had already been constructed by other miners on a previous occasion. How, then, could the accident have occurred as a result of following out the captain's directions, conceding that it would not have happened, had the shorter sets been used? From any point of view it is difficult to trace the cause of the accident to the orders of the captain. However, the evidence is confusing and indefinite. It is not clear that the captain's orders did not in some way influence the conduct of the miners. It may be cleared up on another trial.

Under the rule of Cruikshank v. St. Paul Fire & Marine Ins. Co., 75 Minn. 266, 77 N. W. 958, the order of the trial court is affirmed.